## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 9:23-cv-81558

SECURITIES AND EXCHANGE COMMISSION,

     **Plaintiff,**

v.

TITANIUM CAPITAL LLC, HENRY ABDO, and
CAROL ANN BARSH,

     **Defendants, and**


ELIAS HALIM ABDO and GANNA MIGULINA,

     **Relief Defendants.**

_____/

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

   Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") for its

complaint against Henry Abdo ("Abdo"), Titanium Capital LLC ("Titanium" or the

"Company"), and Carol Ann Barsh ("Barsh") (collectively, "Defendants"), and Relief

Defendants Elias Halim Abdo ("Elias Abdo") and Ganna Migulina ("Migulina") (collectively,

"Relief Defendants") alleges as follows:

### INTRODUCTION

   1.  This case concerns an international network of promoters and representatives

offering and selling fraudulent securities in Titanium without proper registration or pursuant to

an exemption from such registration.  At the center of this network is Abdo, the manager and

architect of this scheme.  Since 2014, Titanium has raised over $5.3 million from at least 162

U.S. and foreign investors, offering investments in purportedly high-yield "Hedge Fund Senior

Note Agreements." Abdo told investors varying stories about Titanium's investment strategy. But typically, Abdo explained to investors that Titanium would loan investors' pooled funds to traders operating on Titanium's proprietary currency exchange platform, and that investors would receive guaranteed double-digit returns with no risk of loss. None of these claims were true.

2.       In fact, Titanium did not execute any of these promised transactions. Instead, Abdo and Titanium misappropriated investor assets by, among other things, paying returns to earlier investors, transferring funds to Abdo's family members and other related parties, paying commissions to Titanium's promoters, and financing Abdo's international travels.

3.       In short, the investment is a sham, and Abdo, both individually and through Titanium, was operating a Ponzi scheme. Abdo and Titanium knowingly or recklessly perpetuated this fraud by engaging in inherently deceptive conduct – such as by making Ponzi payments and providing false account information – and by making numerous materially false and misleading statements, as described herein.

4.       To pull in more investor victims, Abdo recruited multiple promoters, such as Barsh, to assist in offering and selling, without proper registration or pursuant to an exemption from such registration, Titanium's securities. Using information provided by Abdo and Titanium, these promoters solicited investors to purchase Titanium securities and were paid commissions based on their sales.

5.       In addition to their false and misleading claims about Titanium's use of investor funds and related deceptive conduct, Abdo and Titanium also falsely claimed to prospective and current investors that Titanium was registered with the Commission and that it was independently audited.

6.      Abdo's and Titanium's misconduct continued until last month, when Abdo was arrested by the FBI.  Between 2022 and November 2023, Titanium raised at least $866,000 from investors based on these false and misleading claims and deceptive acts.  Consistent with their practice of misappropriating investor assets, Abdo and Titanium have used most of these newly raised funds to finance Abdo's personal expenses, pay related parties, and make Ponzi payments to earlier investors.

7.      Through their fraudulent conduct, the Defendants have violated Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a) and (c)], and Abdo and Titanium have violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) and of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      The Commission seeks a permanent injunction against Abdo, Titanium, and Barsh, permanently enjoining them from future violations of the securities laws, a conduct-based injunction against Abdo, and a bar against Abdo, prohibiting him from acting as an officer or director of a registered or reporting issuer.  The Commission also respectfully requests that the Court order Defendants and Relief Defendants to pay disgorgement and prejudgment interest, Defendants to pay civil penalties, and such other relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

10.      Venue is proper in this District because Titanium has an office here, and because many of Abdo's and Titanium's acts and transactions constituting the violations alleged in this

Complaint occurred in the Southern District of Florida.  Titanium is a registered Florida LLC.

One of Titanium's office and mailing addresses is in North Palm Beach, Florida, within the

Southern District of Florida.  This North Palm Beach address was used to open several Titanium

bank accounts through which Abdo and Titanium misappropriated investor funds.  Several of

these accounts were opened at bank branches in the Southern District of Florida.  In addition,

both the Company's prospectus and a number of Titanium investment contracts listed the

Company's North Palm Beach address.  Titanium also offered and sold its securities to investors

located in the Southern District of Florida.

11.     In connection with the conduct alleged in this Complaint, Defendants made use of

the means or instruments of transportation and communication in interstate commerce, and the

mails.  Among other things, as alleged below, Defendants have used phones, email, the Internet,

messaging platforms, and bank wires to perpetrate their scheme.

## DEFENDANTS AND RELIEF DEFENDANTS

**A.**     **Defendants**

12.     **Titanium** is an active Florida LLC, formed in 2014.  Titanium markets itself as a

"Secure Multi-Currency Fixed Income Fund" "with assets of over $20 million under

management."  At no time was Titanium registered with the Commission, nor did it have a class

of securities registered with the Commission.

13.     **Abdo**, age 46, is a Lebanese national with a U.S. visa and addresses in Florida.

Abdo is the founder, principal shareholder, fund manager, CEO, and Chairman of Titanium.  He

is not registered with the Commission in any capacity, nor is he, to the SEC's knowledge,

associated with an entity registered with the Commission.  Abdo is a signatory and account

holder of Titanium's known U.S.-based bank accounts.  Between December 2014 and the

present, he spent almost all investor funds generated by Titanium's fraudulent sale of securities, which, additionally, were offered and/or sold without proper registration or pursuant to an exemption from such registration.

14.     **Barsh**, age 60, is a resident of Edwardsville, Pennsylvania.  Barsh was a representative of Titanium who promoted Titanium's fund to several U.S. investors and potential investors and served as a Company representative.  She is not registered with the Commission in any capacity, nor is she, to the SEC's knowledge, associated with any broker-dealer registered with the Commission.  Between November 2019 and November 2022, Barsh received at least $20,000 in commissions from offering and selling, without proper registration or pursuant to an exemption from such registration, Titanium's securities to investors.

     **B.**    <u>**Relief Defendants**</u>

15.     **Elias Abdo**, age unknown, is a Lebanese national and a relative of Abdo. Between August 2015 and September 2023, Elias Abdo received at least $100,800 individually, and another $101,700 was transferred from Titanium to accounts held jointly by Elias Abdo and Henry Abdo.  While these illicit proceeds included U.S. investor funds, many of these jointly held bank accounts were located outside of the United States.  These funds represent proceeds from the securities fraud alleged herein that Elias Abdo received for no consideration and without any legitimate claim to the funds.

16.     **Ganna Migulina**, age unknown, is Abdo's wife.  Between June 2015 and September 2023, Migulina received at least $200,000 from Titanium's bank accounts, including U.S. investor proceeds from the securities fraud alleged herein for no consideration and without any legitimate claim to the funds.

## CERTAIN VICTIMS

17.     **Investor 1** is an 87-year-old resident of California.  He invested $333,000 in Titanium via two checks in June 2022 with memo lines reading "to fund 100K note" and "to fund 233K note," respectively.  To invest in Titanium, Investor 1 liquidated a brokerage account and cashed out his savings.  Investor 1's expectation was that these funds would be invested in a manner consistent with Abdo's and Titanium's representations in fund documents and other oral and written communications.

18.     **Investor 2** is a 54-year-old resident of Pennsylvania.  He invested $60,000 in Titanium via a wire transfer in February 2020 and a check in December 2020.  Based on oral representations from Barsh and Abdo and written materials from Titanium, Investor 2 believed his funds would be profitably invested in the manner described.  To date, Investor 2 has not received any returns from his investments.

19.     **Investors 3 and 4** are 71-year-old retirees who reside in Pennsylvania.  In November 2019, they invested $30,000 with Titanium via wire transfer with the expectation that their funds would be invested in Titanium in a manner consistent with Barsh's representations and those made by Abdo and Titanium in fund documents and other oral and written communications.

20.     **Investor 5** is a 53-year-old resident of Georgia.  In December 2020 and February 2021, she invested $50,000 and $73,000 in Titanium, respectively.

21.     **Investor 6** is a 49-year-old resident of North Carolina.  In October 2019, he invested $75,000 in Titanium with the understanding that his funds would be invested in a manner consistent with Abdo's and Titanium's representations in fund documents and other oral and written communications.

22.     **Investors 7 and 8** are 52- and 58-year-old residents of Florida, specifically of this District.  They invested approximately $190,000 in Titanium between 2017 and 2020 with the expectation that their funds would be invested in a manner consistent with Abdo's and Titanium's representations in fund documents and other oral and written communications.

## FACTS

### A.     The Titanium Investment Scheme

23.     Since at least 2014, Abdo and Titanium have solicited and obtained more than $5.3 million from at least 162 investors worldwide, who believed they were making a zero-risk investment.  Abdo and Titanium told most investors that their investments were used to secure loans to third-party traders using "a proprietary multi-currency exchange platform" and that Titanium had never registered "a single monthly loss."  Abdo and Titanium have misappropriated virtually all investor money, even as they continued until Abdo's recent arrest to solicit new investors and obtain additional funds.

24.     Claiming to operate in more than 100 countries with an international advisory board including Nobel Laureates and international politicians, Titanium offered investments in a "Multi Currency Investment Fund" via "Hedge Fund Senior Note Agreements" (the "Subscription Agreements").  Abdo is the manager of this purported fund and signed the Subscription Agreements, initialing each page on Titanium's behalf.

25.     Abdo and Titanium, both directly and through promoters such as Barsh, guaranteed annual returns of 10 percent for a one-year investment, 12 percent for a two-year investment, and 15 percent for a three-year investment, with interest available on an annual, bi-annual, or quarterly basis.  Some investors were promised incentivized return levels if, for example, it took less time for them to decide to invest.

26.     Investors were unable to access their principal until the end of the selected term, and Titanium required 90 days' written notice from investors before they could withdraw their funds.  Otherwise, terms were automatically renewed.

27.     Some of Titanium's investors agreed to roll over their investments at the end of the selected term instead of receiving a pay-out, believing that doing so would lead to compounded interest.  These roll overs allowed Abdo and Titanium to capture investor funds for longer, without the pressure to provide interest payments or return investors' principal.

**B.     Defendants' Fraudulent Offer and Sale of Securities in Titanium**

28.     Abdo often spoke directly to prospective investors and signed Subscription Agreements as Titanium's manager.  In addition to his own efforts, Abdo recruited a network of individuals, including existing investors, to solicit new investors.

29.     For instance, prior to investing in Titanium, Investor 1 attempted to conduct his own due diligence through the promoter who introduced him to Titanium.  Investor 1 asked the promoter for testimonials from other investors, contacts at Titanium's banks, and a profit and loss statement.  Based on responses to his inquiries, Investor 1 believed that Titanium was not a Ponzi scheme, and that his funds would be safely deposited at a U.S. bank, untouched by Titanium.  Investor 1 felt pressured by both Abdo and the promoter to invest sooner rather than later and was impressed by Abdo's supposed background as a chief architect of the Euro currency.  Ultimately, in June 2022, Investor 1 purchased Titanium securities.

30.     Abdo often referenced his faith to exploit the trust of religious investors.  For example, in 2021, a promoter introduced Investor 6 to Abdo to discuss Titanium.  Investor 6 was not convinced he would invest until Abdo told him they were of the same faith.  Abdo's shared affinity made Investor 6 trust Abdo and believe his assertion that Titanium was a safe

investment.  Similarly, Investors 7 and 8 were introduced to Abdo in 2015 at a church in Turkey.
Over the course of three years, Investors 7 and 8 signed several Subscription Agreements with
Abdo, investing approximately $190,000.

31.     As recently as September 2023, as part of an FBI investigation, Abdo directly
offered to sell Titanium securities to an undercover agent.

32.     As a promoter, Barsh introduced investors to Titanium who had otherwise never
heard of it.  For instance, Barsh told Investors 2, 3, and 4 that Titanium was entirely secure.  Like
Abdo, Barsh recruited these investors from within her own religious community.  Barsh
contacted Investor 2 about the opportunity to invest in Titanium.  As part of her pitch, she invited
him to her house to review Titanium's promotional materials and explained what his potential
returns could be.  Prior to their investment, Barsh also directed Investors 3 and 4 to Titanium's
website.  Barsh encouraged Investors 3 and 4 to invest and cited her own returns as proof that
Titanium was a secure investment.  Ultimately, to reassure Investors 2, 3, and 4, Barsh
enthusiastically put them on the phone with Abdo before they invested.  Investors 2, 3, and 4 all
purchased Titanium securities.

33.     Abdo and Titanium also solicited investors through one-on-one communications,
social media posts, outreach on networking websites such as LinkedIn, and the distribution of
promotional materials, including Titanium's elaborate prospectus (the "Prospectus"), which
outlined Titanium's success, security, and promise of guaranteed returns.  The Prospectus
contained claims mirroring those Abdo often made directly to investors.  Abdo appeared in at
least one published interview boasting of Titanium's zero-risk investment and philanthropic
efforts.  Barsh posted the Prospectus and messages about investing with Titanium on her
LinkedIn profile page and shared a photograph of herself and Abdo attending Titanium events.

34.     Interested investors received a blank Subscription Agreement, often via email or the internet-based messaging platform WhatsApp, which outlined the investment amount, rate of return, applicable interest rate, and term of the investment, and included wire and bank account instructions.  Sometimes promoters sent these agreements to investors, and sometimes Abdo did. The Subscription Agreements stated that "at all times" during the investment term, Titanium guaranteed that the investor's principal would "be used in the Hedge Fund model of the company as stated."  The Subscription Agreements listed Abdo as the "Manager" of Titanium and some versions listed the Company's North Palm Beach, Florida address.

35.     To execute the Subscription Agreement, both Abdo and the investor initialed each page and signed under a line reading "[i]ntending to be legally bound hereby, the parties hereto have set their hands and seals" on the date given.  Investor funds transmitted to Titanium were then pooled in its bank accounts, which were owned and controlled by Abdo.

36.     Some investors received welcome materials directly from Abdo via email, including a password and username for an online database where they could access their purported account information.  The account dashboard could include such information as the investor's name, Abdo's contact information as the "account manager," hyperlinks to executed investment contracts, the bank where investor funds were purportedly held, the agreed upon rate of return, and the date investors could expect to receive their return and interest.

**C.     Abdo's and Titanium's Ponzi Scheme and Misappropriation of Victims' Assets**

37.     None of the $5.3 million raised in this way was used by Abdo or Titanium for the stated investment purposes.  Most of that money is now gone, used instead by Abdo and Titanium to make Ponzi-like payments to earlier investors, transfer funds to Abdo's relatives and

10

related parties, and pay Abdo's personal expenditures, such as extensive travel through Europe and Western Asia and cash withdrawals at casinos.

38.     Titanium's known U.S. bank accounts reveal this pattern of misappropriation. For example, Investor 1 invested a total of $333,000 in Titanium via two checks in June 2022. But Investor 1's funds were never used as promised.

39.     On June 27, 2022, when Investor 1's checks posted to Titanium's account ending in -3101, the account had a starting balance of $1,031.85. From June 27 to August 26, 2022, bank statements show that Abdo and Titanium used Investor 1's money to make at least $134,090 in payments to at least 68 other investors, including Investors 3 and 4. Other than Investor 1's investments, there were no incoming deposits to fund these Ponzi payments to earlier investors.

40.     During the same period, Abdo and Titanium also used Investor 1's money to pay five related parties a total of $43,650. As an example, payments were made to:

(1) Elias Abdo, who has no known business association with Titanium, yet received $17,500 via three wire transfers out of Titanium's account ending in -3101 on July 29, 2022, August 12, 2022, and August 25, 2022;

(2) Migulina, Abdo's wife, who received $12,900 via three wire transfers out of Titanium's account ending -3101 on July 27, 2022, July 29, 2022, and August 26, 2022;

(3) Related Party 1, who is listed as the Vice Chairman of Titanium and Special Advisor to the Fund Manager in the Prospectus and received $7,000 via a wire transfer from Titanium's account ending in -3101 on August 4, 2022; and

(4) Related Party 2, who is listed as the Managing Director – Cyprus and the Middle East in the Prospectus and received $5,000 via a wire transfer from Titanium's account ending in -3101 on August 8, 2022.

There were no incoming deposits, other than Investor 1's investment, to fund these related party payments.

41.     Between June 29 and August 31, 2022, Abdo and Titanium also spent over $89,000 of Investor 1's investment funds on various expenses.  For example, Abdo, using a debit card for Titanium's account ending in -3101, made charges at hotels in Malta, Austria, and Turkey, as well as numerous charges to Hotels.com for unknown locations; purchased various flights from different airlines; and made food, clothing, and other shopping purchases.  There were no other incoming deposits, other than Investor 1's investment, to pay for these expenses.

42.     Like Investor 1, Investor 6's $75,000 investment was almost immediately misused by Abdo and Titanium.  On October 21, 2021, this investment increased Titanium's balance in bank account ending in -2710 to $81,456.27.

43.     Within five days of Investor 6's wire transfer to Titanium, approximately $40,000 was disbursed to 32 other investors, including Investor 7.  On October 25, 2021, an additional $16,000 was sent to related parties and a Relief Defendant, including: (1) $3,000 to Related Party 6, listed as Titanium's Head of Russian Markets in the Prospectus; (2) $2,000 to Related Party 5; and (3) $4,000 to Elias Abdo.  Without the funds from Investor 6, Abdo and Titanium could not have covered all these expenses.

44.     Still other examples of this fraudulent and deceptive conduct reveal the extent to which Abdo and Titanium were brazenly operating a Ponzi scheme.  For instance, on November 21, 2019, Investors 3 and 4 invested $30,000 with Titanium via wire transfer.  This investment increased Titanium's balance in bank account ending -2710 to $76,893.60.

45.     Instead of being used as promised, Investor 3 and 4's funds, along with funds of other investors, were transferred from the Titanium bank account ending in -2710 to another Titanium bank account ending in -9768.  On November 27, 2019, Titanium transferred $79,000

between the two bank accounts, increasing the balance in account -9768 to $92,342.62 and decreasing the balance in account -2710 to $4,934.67.

46.     Then, from December 4 through December 26, 2019, the transfer described in Paragraph 45, which included Investor 3 and 4's investment, funded interest payments to 12 other investors, totaling $34,013, including a payment to Investor 7.  This transfer also funded six related party transactions, totaling $23,084.72.  The payments included:

(1) $2,000 to Related Party 3, listed as Titanium's Managing Director for Africa in the Prospectus, on December 9, 2019;

(2) $8,500 to Related Party 1 on December 9, 2019;

(3) $5,000 to Related Party 4, listed as Titanium's Head of Scandinavian Markets Division in the Prospectus, on December 12, 2019; and

(4) $5,000 to Related Party 6 on December 31, 2019.

Lastly, from December 4 through December 31, 2019, the same transfer funded over $20,000 in expenses incurred by Abdo, including $11,831.08 in cash withdrawals, nearly $5,000 of which was taken out at a hotel and casino in Cyprus; $2,386.67 on Turkish Airlines flights; $700.43 at duty free shops in Spain; and $348.88 at Sephora.  Without the money from Investors 3 and 4 and other investors, Abdo and Titanium could not have covered these expenses.

47.     Abdo's and Titanium's conduct is not new or occasional.  They have engaged in this same type of fraudulent and deceptive misconduct for years.  For example, in December 2020 and February 2021, Investor 5 invested $50,000 and $73,000 in Titanium, respectively. Abdo and Titanium used her investment to perpetuate this Ponzi scheme.

48.     On February 24, 2021, Investor 5 deposited a $73,000 check, written to Titanium, into Titanium's account ending in -2710.  The balance in the account prior to Investor 5's deposit was $789.93. From February 24 through March 1, 2021, Investor 5's investment was used to pay returns totaling $39,991 to at least 18 non-U.S. investors.  Abdo also spent $9,074.68 of

these funds on various expenses, including nearly $4,000 in cash withdrawals in Skopje, North Macedonia, and paid nearly $400 each to technology company Alibaba and Pegasus Airlines. Lastly, approximately $21,000 was paid to related parties.  No incoming funds or pre-existing balance during this period covered these expenditures other than Investor 5's funds.

49.     During this time period, Titanium's bank accounts, which Abdo controlled and owned, did not reflect transfers to or from any currency exchange platform or otherwise reflect Titanium's operating of the business described to investors.  Nevertheless, Abdo repeatedly and falsely told investors that their money was profitably invested.  In fact, Investors 2 and 6 could see figures purportedly reflecting their investments, interest rate, interest accrued, and expected pay out dates on their online Titanium dashboards provided to them by Abdo.

50.     Yet those pay out dates consistently came and went.  To avoid revealing his fraud, Abdo discouraged investors from making withdrawals and encouraged them to roll over their investments.  Many investors, despite requests, have still not received their promised investment returns or the return of their principal.  Abdo frequently cited his inability to move funds back to U.S. bank accounts as a reason for these delays.

51.     For instance, Investor 1 spoke to Abdo on the phone several times after he did not receive his first expected interest payment in January 2023.  Between January and April 2023, Abdo represented to Investor 1 that the delays were due to bank processing issues.  After Investor 1's second interest payment date lapsed, Abdo made similar excuses.  Abdo told Investor 1 that because Abdo had changed banks or because the U.S. government needed to approve the transfers, he could not transfer Investor 1's returns on the payout date.  Investor 1 has yet to receive all the returns Abdo and Titanium promised him.

52.     Another example is Investors 3 and 4 who, about a year after originally investing, grew concerned with Titanium's legitimacy and reached out to Barsh to recover their principal investment and accrued interest.  After a lengthy delay, Titanium repaid $30,000 plus earnings of $5,000 to Investors 3 and 4, some of which came from other investors.  For example, on July 27, 2022, Investors 3 and 4 received a payment of $20,000 via wire from Titanium's account ending in -3101.  That payment was funded by Investor 1's June 2022 investment.  There were no other deposits into the account between Investor 1's deposit on June 27, 2022 and the payment to Investors 3 and 4 on July 27, 2022.

53.     Yet another example is Investor 6, who did not receive an interest payment on his investment until he reached out to Abdo multiple times.  Almost a year after his expected pay out date, Investor 6 received an $18,000 interest payment in March 2023.  Unbeknownst to him, this interest payment was mostly funded by the deposits of other investors.  In August 2023, Investor 6 reached out to Abdo again over WhatsApp to inform Abdo that he wanted remittance of his principal and any owed returns when his Subscription Agreement expired in November 2023, Investor 6 wanted a.  In response, Abdo told Investor 6 that he would give him his money back. Investor 6 asked for this assurance in writing, but never received it.  In November 2023, Investor 6 messaged Abdo again, asking for at least a portion of his principal back by the end of the month.  Abdo said he would do his best, signing off with "Jehovah be with you."  Investor 6 never heard from Abdo again.

54.     As a promoter, Barsh also updated investors on their accounts.  Every year after Investor 2's initial investment, Barsh contacted him about his annual profit and asked whether he wanted to roll over his investment.  Believing Barsh's and Titanium's representations that his

interest would compound, Investor 2 opted to roll over his profits several times. He has still never received a payment.

     **D.**    **Abdo's and Titanium's Materially False and Misleading Statements**

55.    To recruit investors and perpetuate this scheme, Abdo and Titanium, in addition to their repeated deceptive conduct, knowingly or recklessly made numerous materially false and misleading statements about Titanium to investors, including through direct conversations with prospective investors, promoters such as Barsh, and in the Prospectus, Subscription Agreements, and other promotional materials.

       **i.**    **Abdo and Titanium Misrepresented Titanium's Investment Strategy and Risks**

56.    Titanium maintained that its investment strategy entailed no risk of loss. Largely, Abdo and Titanium claimed to loan investor funds to traders who made "micro-trades" or exchanged currencies on Titanium's "proprietary multi-currency Forex platform" for a fee, which Titanium allegedly used to generate investor returns. Investors agreed to a fixed term in exchange for "a fixed returns rate."

57.    In a signed statement in the Prospectus, Abdo stated that Titanium's "zero risk trading platform . . . skillfully uses micro-trades and management fees to fix returns irrespective of market conditions." Abdo further represented that Titanium, and its purported parent company ("Titanium Capital PTE"), would underwrite and fully guarantee investors' capital and accrued returns.

58.    Abdo highlighted the unique nature and safety of this investment strategy when pitching Titanium to potential investors. Prior to his June 2022 investment, Investor 1 attempted to conduct due diligence on Titanium. Email responses from the promoter, as well as Titanium's Prospectus, indicated that Abdo, Titanium, and Titanium Capital PTE would cover any losses to

investors.  The Subscription Agreement signed by Investor 1 and Abdo pledged that Investor 1's principal investment was "at all times protected."  These claims led Investor 1 to believe that he was guaranteed to at least receive his principal back and that it would not be misappropriated by Abdo or Titanium.

59.     Similarly, in a June 13, 2023 phone call with an undercover FBI agent, Abdo explained that Titanium used investor funds to lend money to third parties using its proprietary multi-currency exchange platform.  Titanium charges these third parties a commission for using Titanium's "software."  This "software" enabled traders to exchange funds to more profitable currencies within a "fraction of a second."  Abdo further emphasized that Titanium's exchange platform would "work[] as long as" at least "one currency and one commodity" were still traded anywhere in the world, making it "a safe hub . . . for investors."  Abdo also gave his routine pitch about Titanium's guaranteed returns and explained how investment returns could compound to 102 percent if investors opted to receive less frequent payouts.

60.     But no such Titanium currency exchange platform existed.

### ii.     Abdo and Titanium Made False and Misleading Statements Regarding Fees and the Use of Investor Funds

61.     Abdo and Titanium insisted that investors would receive a fixed rate of return, guaranteeing both the principal investment and expected profits.  Abdo and Titanium touted the lack of hidden fees as one of Titanium's advantages over other investments.  Investors were promised the entirety of the agreed-upon rate of return with no deductions for management, administrative, arrangement, entry, exit, or success fees.  Abdo and Titanium represented that only the third-party traders who utilized Titanium's proprietary currency exchange had to pay a transaction fee, which helped secure investors' returns.  Neither the Prospectus nor the Subscription Agreements suggested that investor funds could be used to cover Abdo's personal

17

expenses.  At most, the Prospectus indicated that profits made by Titanium would be "donated to humanitarian causes."

62.     Abdo and Titanium also led investors to believe that no fees or expenses would be deducted from their investments.  For instance, Investor 6 was never informed by Abdo or otherwise that his funds would be used for fees, payments to other investors, or Abdo's personal expenses.

63.     Similarly, in June 2023, Abdo told the undercover FBI agent that commissions were only collected from "transactions for third parties," and not from Titanium's investors. Abdo represented that investment returns would not be diluted by hidden fees but would instead be secured by the fees charged to the traders utilizing Titanium's proprietary exchange.

64.     Abdo's and Titanium's claims were false.  The money collected from investors was not untouched by Titanium.  Instead, it was used to cover commissions to promoters, Abdo's personal expenses, payments to related parties, and Ponzi payments to earlier investors. Titanium's purported exchange did not generate fees that secured investor returns, because investor funds were not used as loans to traders as repeatedly advertised.

### iii.     Abdo and Titanium Made False and Misleading Statements Regarding Titanium's Registration Status with the Commission

65.     To lend legitimacy to this operation and create the false impression that Titanium's conduct was monitored and sanctioned by a U.S. government agency, the Prospectus and Subscription Agreement represented that Titanium was "registered . . . with the Securities & Exchange Commission (SEC) in the United States of America."  Based on their interactions with Titanium representatives and promoters, including Barsh, and the materials they received, Investor 1, Investor 2, and Investors 3 and 4 believed that Titanium was registered with the SEC. In fact, several investor victims specifically inquired about Titanium's status with the

Commission as a factor in their pre-investment due diligence.  In June 2023, Abdo portrayed to the undercover FBI agent that Titanium had been regulated by the U.S. government for the last nine years and that the SEC, IRS, Federal Reserve, and State of Florida closely examined Titanium's books and records.

66.     Although Titanium filed three Form D notices of exempt offerings with the Commission in 2015, 2018, and 2022, Form D filings do not represent registration with, or approval by, the SEC.  In truth, Titanium is not, and has never been, registered with the Commission in any capacity.

> ### iv.     Abdo and Titanium Made False and Misleading Claims that Titanium was Independently Audited

67.     Titanium's Prospectus also represented that Titanium is "[i]ndependently audited."

68.     This statement is false.  There is no evidence that Titanium was subject to the scrutiny of an independent auditor.  Instead, Titanium's only alleged accountant is also its registered agent, not an independent auditor.  This individual, referred to elsewhere in this Complaint as Related Party 5, is a signatory on many of Titanium's accounts and is responsible for much of its banking, including conducting transfers between accounts, depositing funds, and writing checks to investors and related parties.  Related Party 5 signed Titanium's Form D filings with the Commission and has sent and received numerous transfers to and from Titanium's bank accounts.

> ### E.     Defendants' Unregistered Offer and Sale of Securities

69.     Based on the facts alleged above and herein, Defendants offered and sold securities in Titanium without proper registration or pursuant to an exemption from such registration.  Pursuant to the Subscription Agreements, investors' money was to be placed in a

common fund, of which Abdo was the ostensible fund manager and Titanium's primary control person.  Investors were passive – their funds were "locked up" for various periods of time – and were entirely dependent on Abdo's and Titanium's investment expertise and efforts to realize any purported returns.

70.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities that Defendants offered and sold.

71.     Instead, Titanium made Form D filings with the Commission in 2015, 2018, and 2022, stating that offerings by Titanium were exempt from the registration requirements imposed by the federal securities laws pursuant to Rule 504(b)(1) of Regulation D of the Securities Act. These filings listed Abdo as a "manager" and described the types of securities offered as "Pooled Investments 99 Accredited LLC Members."  However, Titanium failed to comply with the rules that would permit such an exemption.  As such, the Titanium securities offerings were not exempt from the registration requirements of Sections 5(a) and (c) of the Securities Act.

72.     Defendants also engaged in general solicitation by offering investments in Titanium to many investors in the United States and abroad.  Abdo and promoters for Titanium, such as Barsh, contacted potential investors with whom they had no prior relationship and posted information about Titanium on public social media accounts.  For example, Barsh created posts soliciting new investors on her publicly available LinkedIn profile.  In one such post, Barsh posted a link to a YouTube video about Titanium's "Comparative Analysis" with the caption: "Just another great reason to invest with Titanium Capital LLC.  Feel free to contact me with more details. #investment #investments #finance #investing."  Abdo also spoke about Titanium's purported zero-risk trading platform and guaranteed returns in at least one published interview.

**F.     Abdo and Titanium Continued to Solicit and Deceive New Victims**

73.     From January through October 2023, Abdo and Titanium raised nearly $428,000 from at least seven investors.  Nearly a third of these funds came from new investors who appear to have been solicited by Abdo and Titanium in the last year.

74.     Abdo and Titanium also continued to make fraudulent interest payments to earlier investors, make payments to related parties and Relief Defendants, and pay for Abdo's globetrotting and personal expenses.

75.     For example, from January through October 2023, Abdo and Titanium paid out approximately $170,000 to investors; made over $80,000 in cash withdrawals across the world, including in Las Vegas, Kuala Lumpur, and a casino in Macao; and spent close to $40,000 on expenses such as hotels, flights, jewelry stores, and restaurants.

76.     From January to October 2023, Abdo and Titanium also made close to $80,000 in payments to related parties, including wire payments to Elias Abdo described as "living expenses" and "sick mother expenses."  Similarly, since January 2023, close to $23,000 was wired to Migulina.

77.     In addition, Titanium, through Abdo and other account signatories, opened at least four new bank accounts in the United States since December 2022 to continue this fraud.

78.     Abdo and Titanium continued to solicit new victims and deceive existing investors during this period.  After his initial June 2023 call, Abdo met with the undercover FBI agent as recently as September 2023.  In both conversations, Abdo made brazen misrepresentations in the hopes of soliciting investments.

### G.     Abdo and Titanium Acted Knowingly or Recklessly by Operating a Ponzi Scheme and When Making the Misrepresentations Described Above

79.     As alleged above, Abdo acted knowingly or recklessly when he misappropriated assets for his own personal use, diverted new investor funds to earlier investors, posted false investor account information, and made claims to investors about his investment strategy that he must have known were false.  As alleged herein, Abdo is the founder of Titanium, its public representative, and controls the Company.  Abdo signed the account opening documents for the Titanium accounts referenced in this Complaint and provided government-issued identification to open the accounts at several banks.  Additionally, a number of Western Union wire transfers to investors, related parties, and Relief Defendants were initiated by Abdo.  As described above, the misappropriated investor funds were transferred in and out of these bank accounts owned and accessed by Abdo.  Further, Abdo made several debit card charges using investor funds in Titanium's accounts.

### H.     Relief Defendants Received Proceeds from Defendants' Fraud, to Which They Have No Legitimate Claim

80.     As alleged above, both Relief Defendants received proceeds from Defendants' fraud for which they provided no reciprocal goods or services, and to which they have no legitimate claim.  As a result, those funds should be returned to Titanium's defrauded investors.

## VIOLATIONS ALLEGED

## COUNT I

**Unregistered Offers and Sales of Securities in Violation of Sections 5(a) and 5(c) of the Securities Act**

**(All Defendants)**

81.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

82.     By engaging in the conduct described above, Defendants directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or delivery after sale.

83.     No valid registration statement was filed with the Commission or was in effect with respect to any offering or sale alleged herein (Paragraphs 69–72).  Despite the filing of three Forms D on behalf of Titanium in 2015, 2018, and 2022, there was no exemption applicable for the offer and sale of the Titanium securities from the registration requirements of the Securities Act (Paragraphs 70–71).

84.     By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

**Fraud in Connection with the Offer or Sale of a Security in Violation of Section 17(a)(1) of the Securities Act**

**(Against Defendants Abdo and Titanium)**

85.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

86.     From at least 2014 through the present, Defendants Abdo and Titanium, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes, or artifices to defraud by using new investor money to pay previous investors, misappropriating investor funds, and purporting to operate as a legitimate company while in fact operating as a Ponzi scheme (Paragraphs 37-54).

23

87.     By engaging in the conduct described above, Defendants Abdo and Titanium each violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

**Fraud in Connection with the Offer or Sale of a Security in Violation of Section 17(a)(2) of the Securities Act**

**(Against Defendants Abdo and Titanium)**

88.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

89.     From at least 2014 through the present, Defendants Abdo and Titanium, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading by misrepresenting to investors, among other things, the registration status of the Company, the use of their assets, and the source of purported returns (Paragraphs 55-68).

90.     By engaging in the conduct described above, Defendants Abdo and Titanium each violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT IV

**Fraud in Connection with the Offer or Sale of a Security in Violation of Section 17(a)(3) of the Securities Act**

**(Against Defendants Abdo and Titanium)**

91.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

92.     From at least 2014 through the present, Defendants Abdo and Titanium, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, or courses of business which have operated, are now operating, or will operate as a fraud or deceit upon the purchasers by using new investor money to pay previous investors, misappropriating investor funds, and by purporting to operate as a legitimate company while in fact operating as a Ponzi scheme (Paragraphs 37-54).

93.     By engaging in the conduct described above, Defendants Abdo and Titanium each violated, and unless restrained and enjoined will continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT V

### Fraud in Connection with the Purchase or Sale of Securities in Violation of Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act

**(Against Defendants Abdo and Titanium)**

94.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

95.     From at least 2014 through the present, Defendants Abdo and Titanium, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of any security by using new investor money to pay previous investors, misappropriating investor funds, and by purporting to operate as a legitimate company while in fact operating as a Ponzi scheme (Paragraphs 37-54).

96.     By engaging in the foregoing misconduct, Defendants Abdo and Titanium each violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

## COUNT VI

### Fraud in Connection with the Purchase or Sale of Securities in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act

### (Against Defendants Abdo and Titanium)

97.     The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

98.     From at least 2014 through the present, Defendants Abdo and Titanium, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in connection with the purchase or sale of any security.

99.     By engaging in the foregoing misconduct, Defendants Abdo and Titanium each violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17C.F.R. § 240.10b-5(b)] thereunder.

## COUNT VII

### Unjust Enrichment

### (Against All Relief Defendants)

100.    The Commission repeats and realleges Paragraphs 1 through 80 of this Complaint.

101.    Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the

securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

102.    As described above, Relief Defendants received investor funds and assets that were the proceeds, or are traceable to the proceeds, of Defendants' unlawful activities, as alleged in Paragraphs 1 through 80 above, and Relief Defendants have no legitimate claims to those proceeds and gave no consideration for exchange of those funds.

103.    Relief Defendants obtained the funds and assets as part of and in furtherance of the securities violations alleged in Paragraphs 1 through 80 above and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds and assets.  As a consequence, Relief Defendants were unjustly enriched.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find Defendants committed the violations alleged, and grant the following relief:

### A.    Permanent Injunction

Issue an Order permanently restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

### B.    Conduct-Based Injunction

Issue an Order pursuant to Exchange Act Sections 21(d)(1) and 21(d)(5) [15 U.S.C. §§ 78u(d)(1) and (5)] permanently enjoining Abdo from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Abdo from purchasing or selling securities for his own personal account.

C.     **Disgorgement and Prejudgment Interest**

Issue an Order directing all Defendants and Relief Defendants to disgorge all profits or proceeds received from investors as a result of the misrepresentations, acts and/or courses of conduct complained of herein, with prejudgment interest thereon, with such disgorgement and prejudgment interest on a joint and several basis as to Abdo and Titanium, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and (7)].

D.     **Civil Monetary Penalties**

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

E.     **Officer and Director Bar**

Issue an Order pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d) of the Exchange Act [15 U.S.C. § 77u(d)] permanently prohibiting Abdo from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

F.     **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

G.     **Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## <u>DEMAND FOR JURY TRIAL</u>

The Commission hereby demands a jury trial on any and all issues so triable.

Dated: December 14, 2023

Respectfully submitted,

_____/s/_____
Daniel J. Maher
Trial Counsel
S.D. Fla. Bar No. A5502597
Telephone: 202-551-4737
MaherD@sec.gov

Rebecca R. Dunnan
Trial Counsel
S.D. Fla. Bar No. A5503152
Telephone: 202-551-3813
DunnanR@sec.gov

Brook Jackling DeVeas
Counsel
S.D. Fla. Bar No. A5503155
Telephone: 202-551-2302
JacklingB@sec.gov

Adrienne Adkins
Counsel
Telephone: 202-551-5474
AdkinsAdr@sec.gov

Attorneys for Plaintiff
**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
100 F Street, NE
Washington, DC 20549

OF COUNSEL:
Amy L. Friedman
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
FriedmanA@sec.gov